UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CAL DIVE OFFSHORE CONTRACTORS,
INC., *et al.*,

                                    Plaintiffs,                          15-CV-2788 (JPO)

                    -v-                                                  OPINION AND ORDER

M/V SAMPSON, *et al.*,

                                    Defendants.

J. PAUL OETKEN, District Judge:

        Plaintiffs Cal Dive Offshore Contractors, Inc., Cal Dive International, Inc., and Gulf

Offshore Construction, Inc. (collectively "Cal Dive"), filed this action against Defendants M/V

SAMPSON, her engines, tackle, appurtenances, equipment, etc. (the "SAMPSON"), *in rem*, and

CVI Global Lux Oil and Gas 4 S.a.r.l. ("CVI") and CarVal Investors, LLC ("CarVal"), *in*

*personam*, to enforce a maritime lien.  (Dkt. No. 1.)  This case was transferred to this Court from

the Northern District of Florida (Dkt. No. 44), along with a motion to dismiss filed by CarVal

(Dkt. No. 30).  Cal Dive now seeks summary judgment that it is entitled to an *in rem* judgment

against the SAMPSON.  (Dkt. No. 69.)  CVI seeks summary judgment that all of Cal Dive's

claims—both *in rem* and *in personam*—fail as a matter of law.  (Dkt. No. 75.)  For the reasons

that follow, CarVal's motion to dismiss is denied; Cal Dive's motion for summary judgment is

denied; and CVI's motion for summary judgment is granted in part and denied in part.

I.      **Background**

        The following facts are taken from the parties' 56.1 statements and briefs and are

undisputed unless otherwise noted.

        At all relevant times, CVI was the title owner of the SAMPSON, a Panamanian flagged

motor vessel capable of laying pipe for the oil industry.  (Dkt. No. 78 ¶ 1; Dkt. No. 81 ¶ 1.)  CVI

chartered the SAMPSON to Oceanografia, S.A. de C.V. ("Oceanografia") pursuant to a charter

party dated November 16, 2012 (and amended in December 19, 2012).  (Dkt. No. 78 ¶ 2; Dkt.

No. 81 ¶ 5.)  Relevant to the present action, the charter party contained a no-lien clause

prohibiting Oceanografia from incurring a lien against the SAMPSON.  (Dkt. No. 78 ¶ 3; Dkt.

No. 81 ¶ 8.)  The parties dispute whether, at the relevant time, Cal Dive had actual knowledge of

the no-lien clause contained in the charter party between CVI and Oceanografia.  (Dkt. No. 78

¶ 6; Dkt. No. 81 ¶ 11.)

Pursuant to the charter party, CVI would provide the below-deck crew to the SAMPSON

and Oceanografia would provide the above-deck crew.  (Dkt. No. 69 at 3; Dkt. No. 44 at 2.)  CVI

contracted with Cal Dive to provide below-deck support pursuant to a Ship Management

Agreement (Dkt. No. 1-1), executed on January 15, 2013.  (Dkt. No. 81 ¶ 12.)  Cal Dive also

provided an above-deck pipe-laying crew to supervise and assist in the SAMPSON's pipe-laying

activities (Dkt. No. 78 ¶ 4), though the parties disagree as to whether this crew was ordered by

the charterer, Oceanografia, or by CarVal on behalf of the ship owner, CVI (Dkt. No. 69 at 3-4).[1]

The current dispute relates to the failure to complete payment to Cal Dive for its pipe-laying

services, leaving a balance due to Cal Dive of $1,623,459.92.  (Dkt. No. 78 ¶ 7; Dkt. No. 81

¶ 35.)

Both CarVal's motion to dismiss and the parties' cross-motions for summary judgment

are currently pending before the Court.

---

[1]  Pursuant to a separate agreement, Oceanografia and CVI were required to utilize only
one company to provide both the below-deck and above-deck crew—in this case, Cal Dive.
(Dkt. No. 81 ¶ 4.)

## II.      CarVal's Motion to Dismiss

Cal Dive seeks to enforce a maritime lien *in rem* against the SAMPSON under Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims, and *in personam* against CarVal under Rule B.  (Dkt. No. 1 at 2.)  CarVal has moved to dismiss the complaint against it for failure to state a claim.  (Dkt. No. 30.)

### A.      Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In considering a motion to dismiss, courts must accept as true all "factual allegations contained in the complaint," *Twombly*, 550 U.S. at 572, and must draw "all inferences in the light most favorable to the non-moving party*," In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (Sotomayor, J.).

### B.      Discussion

The Complaint alleges that Cal Dive provided personnel to the SAMPSON to assist with "pipe laying and related activities."  (Dkt. No. 1 at 4.)  It further alleges that the total amount to be paid for Cal Dive's services was $3,574,305.92 (*id.* at 5), and that Cal Dive is still owed $1,623,459.92 (*id.* at 6).  The Complaint claims that CarVal is liable both (1) through an *in rem* action against the SAMPSON[2]; and (2) directly, through an *in personam* action.

---

[2]   Though the Complaint is silent as to the statute under which the Court has jurisdiction over the action, the Court determines that the Complaint claims a maritime lien against the vessel pursuant to the Maritime Commercial Instruments and Liens Act of 1988 ("the Act"), which provides that "a person providing necessaries to a vessel on the order of the owner or a person

"[A maritime] lien arises to secure creditors who provide 'necessaries'—'supplies, repairs and equipment . . . ordered on the credit of the ship and which are generally beneficial to the ship.'" *Marine Oil Trading Ltd. v. Motor Tanker PAROS,* 287 F. Supp. 2d 638, 640-41 (E.D. Va. 2003) (quoting William Tetley, *Maritime Liens and Claims* 551 (2d ed. 1998)); *see also Clubb Oil Tools, Inc. v. M/V George Vergottis*, 460 F. Supp. 835, 840 (S.D. Tex. 1978) (broadly interpreting "necessaries" to include labor provided for the ship). "[U]nder 46 U.S.C. § 31342, any entity that supplies a vessel with 'necessaries,' . . . 'on the order of the owner or a person authorized by the owner' has a maritime lien on the vessel and is entitled to bring a civil action *in rem* to enforce that lien." *UPT Pool Ltd. v. Dynamic Oil Trading (Singapore) PTE. Ltd.*, No. 14 Civ. 9262, 2015 WL 4005527, at *4 (S.D.N.Y. July 1, 2015), *aff'd sub nom. Hapag-Lloyd Aktiengesellschaft v. U.S. Oil Trading LLC*, 814 F.3d 146 (2d Cir. 2016).

Accepting as true all "factual allegations contained in the complaint," *Twombly*, 550 U.S. at 572, the Court concludes that the Complaint sufficiently alleges the existence of a proper maritime lien against the SAMPSON by alleging that Plaintiffs provided "necessaries" for the benefit of the ship (Dkt. No. 1 at 4), for which they were not reimbursed.[3]

And "[w]hen a maritime lien attaches, the plaintiff may pursue an in rem action against the vessel involved." *Dowell Div. of the Dow Chem. Co. v. Franconia Sea Transp., Ltd.*, 504 F. Supp. 579, 581 (S.D.N.Y. 1980), *aff'd*, 659 F.2d 1058 (2d Cir. 1981). Besides an *in rem* action against the vessel, "[t]he plaintiff also has the option of bringing an in personam action against any party that is directly liable in contract, tort, or some other substantive law." *Id.* However, if

---

authorized by the owner . . . has a maritime lien on the vessel," and "may bring a civil action *in rem* to enforce the lien." 46 U.S.C. § 31342.

[3] The existence of a maritime lien is likewise disputed in the parties' briefing on the pending motions for summary judgment, discussed below.

there is no "separate basis of substantive liability," the *in personam* liability does not attach

"merely because a maritime lien has come into existence." *Id.*; *see also* Notes of Advisory

Committee on Rules, Rule C Supplemental Rules for Admiralty and Maritime Claims of the

Federal Rule of Civil Procedure (noting that "no action *in personam* may be brought when the

substantive law imposes no personal liability").

      CarVal argues that the Complaint fails to state a plausible claim for relief against it under

either an *in rem* or *in personam* theory of liability.  The Court addresses each in turn.

      First, CarVal argues that it "is not the owner of the SAMPSON and has not made an

appearance to claim the SAMPSON, thus there is no possibility for Carval to be responsible for

any potential *in rem* liability of the vessel."  (Dkt. No. 30-1 at 5.)  The Court agrees.  A maritime

lien "gives the creditor a special property in the ship, which subsists from the moment the debt

arises, and it gives him a right to have the ship sold that his debt may be paid out of the proceeds

of the sale.  It is a right in the vessel, a jus in re."  *Itel Containers Int'l Corp. v. Atlanttrafik Exp.*

*Serv. Ltd.*, 982 F.2d 765, 768 (2d Cir. 1992) (quoting *The Poznan*, 9 F.2d 838, 842 (2d Cir. 1925)

(internal quotation mark omitted)).  As such, even assuming the existence of a valid maritime

lien, the *in rem* action that arises from that lien is against the SAMPSON and does not state a

claim against CarVal.  *See* 2 C.J.S. Admiralty § 90 ("An action in rem in admiralty is a

proceeding against a specific thing or res rather than against an individual, and in this form of

proceeding, the owner of the property constituting the subject of the proceeding is not recognized

until appearing, entering a claim, and defending."); *Dowell Div.*, 504 F. Supp. at 581 (S.D.N.Y.

1980) ("In the absence of a separate basis of substantive liability . . . the shipowner cannot be

held personally liable to the plaintiff merely because a maritime lien has come into existence.").

      Second, with respect to the *in personam* claims, CarVal argues that the Ship Management

Agreement discussed in the Complaint "is a contract between CVI and [Cal Dive]," and does not

implicate or bind CarVal.  (Dkt. No. 30-1 at 5-6.)  As such, "[t]he face of the contract and the allegations of the complaint establish that [CarVal] is not a party to the contract," and, therefore, that CarVal "can have no liability under the contract."  (*Id.* at 6.)

For its part, Cal Dive argues that CarVal misses the point, as its "claims are not based upon the Ship Management Agreement."  (Dkt. No. 34 at 3.)  Instead, its claims against CarVal are "based upon the supply and related expenses of 'the pipe laying crew.'"  (*Id.* at 4.)  The Complaint alleges that "defendants [including CarVal] requested that [Cal Dive] supply the above deck crew."  (Dkt. No. 1 at 4.)  Further, the Complaint alleges that, for its pipe laying services, Cal Dive "agreed that it could be paid from defendants' trust" (*id.* at 5), and that Cal Dive believed that it was relying on "the guarantee of [CarVal] that [Cal Dive] would be paid if Oceanografia failed to pay" (*id.*).

"[O]ral contracts are generally regarded as valid by maritime law."  *Kossick v. United Fruit Co.*, 365 U.S. 731, 734 (1961).  In order to recover on a claim for breach of oral contract, Cal Dive "must prove (1) the terms of a maritime contract; (2) that the contract was breached; and (3) the reasonable value of the purported damages."  *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1249 (11th Cir. 2005).  The facts as alleged in the Complaint are sufficient to establish an oral contract between Cal Dive and CarVal for the provision of above-deck personnel, which was allegedly breached, such that Cal Dive is still owed $1,623,459.92.  *See also Dowell Div.*, 504 F. Supp. at 581 (S.D.N.Y. 1980) ("plaintiff . . . may bring[] an *in personam* action against any party that is directly liable in contract").  Therefore, CarVal's motion to dismiss the claims against it is denied.

## III.   Summary Judgment

Cal Dive seeks summary judgment that it is entitled to an *in rem* judgment against the SAMPSON.  (Dkt. No. 69.)  CVI seeks summary judgment that all of Cal Dive's claims—both

*in rem* and *in personam*—fail as a matter of law.  (Dkt. No. 75.)

### A.    Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A fact is

material if it "might affect the outcome of the suit under the governing law."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if, considering the record as

a whole, a rational jury could find in favor of the non-moving party.  *Ricci v. DeStefano*, 557

U.S. 557, 586 (2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986)).

On summary judgment, the party bearing the burden of proof at trial must provide

evidence on each element of its claim or defense.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

(1986).  "If the party with the burden of proof makes the requisite initial showing, the burden

shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*,

that reasonable jurors could differ about the evidence."  *Clopay Plastic Prods. Co. v. Excelsior*

*Packaging Grp., Inc.*, No. 12 Civ. 5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014)

(citing Fed. R. Civ. P. 56(c); *Liberty Lobby*, 477 U.S. at 250-51).  The court views all evidence

"in the light most favorable to the nonmoving party" and summary judgment may be granted

only if "no reasonable trier of fact could find in favor of the nonmoving party."  *Allen v.*

*Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks omitted).

### B.    Discussion

The Court first addresses whether either party is entitled to summary judgment on the

question whether Cal Dive has a valid maritime lien against the SAMPSON that it may enforce

through an action *in rem*.  The Court then turns to whether summary judgment is warranted on

the question whether defendants CVI and CarVal are directly liable *in personam*.

1.      *In Rem* Action Against the SAMPSON

"In the case of a maritime lien, the vessel itself is viewed as the obligor, regardless of whether the vessel's owner is also obligated." *Triton Marine Fuels Ltd., S.A. v. M/V PACIFIC CHUKOTKA*, 575 F.3d 409, 414 (4th Cir. 2009); *see also* Black's Law Dictionary 943 (10th ed. 2014) ("[The maritime lien] arises by operation of law and exists as a claim upon the property, secret and invisible." (quoting Griffith Price, *The Law of Maritime Liens* 1 (1940))). "A maritime lien may be defined as: (1) a privileged claim, (2) upon maritime property, (3) for service done to it or injury caused by it, (4) accruing from the moment when the claim attaches, (5) traveling with the property unconditionally, (6) enforced by means of an action in rem." *Id.* (quoting Price at 1). "The lien gives the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds of the sale." *Trans-Tec Asia v. M/V HARMONY CONTAINER*, 518 F.3d 1120, 1128 (9th Cir. 2008).

Only certain individuals have the authority to bind the vessel so as to give rise to a maritime lien. "It is a fundamental tenet of maritime law that '[c]harterers and their agents are presumed to have authority to bind the vessel by the ordering of necessaries.'" *Triton Marine Fuels Ltd.*, 575 F.3d at 414 (alteration in original) (quoting *Trans–Tec Asia,* 518 F.3d at 1127-28); *see also* 46 U.S.C. § 31341(a)(4)(B) ("[A]n officer or agent appointed by—a charterer" is "presumed to have authority to procure necessaries for a vessel."). "'The § 31341 presumptions are of immense value to the supplier' because the supplier need not 'know anything about the authority of the manager of the ship beyond the fact that such individual apparently exercises that degree of control over the vessel that could be expected of any [entrusted] agent of the owner.'" *World Fuel Servs. Trading, DMCC v. M/V HEBEI SHIJIAZHUANG,* 12 F. Supp. 3d 792 (E.D. Va. 2014) (alteration in original) (quoting 2 Benedict on Admiralty § 40, at 3–41 (7th ed. 1998)), *aff'd sub nom. World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783

F.3d 507 (4th Cir. 2015).

However, "when necessaries are ordered by one without authority to bind the vessel," and when the vessel owner can "show that the supplier of necessaries had actual knowledge of the existence of any lack of authority relied upon as a defense," no lien arises. *Belcher Oil Co. v. M/V GARDENIA*, 766 F.2d 1508, 1512 (11th Cir. 1985) (internal quotation marks omitted) (quoting *Jan C. Uiterwyk Co., Inc. v. M/V MARE ARABICO*, 459 F.Supp. 1325, 1331 (D. Md. 1978)); *see also Am. Oil Trading, Inc. v. M/V SAVA*, 47 F. Supp. 2d 348, 352 (E.D.N.Y. 1999) ("[L]ack of authority to order necessaries defeats a maritime lien."). Because "[a]ctual knowledge of a prohibition of lien clause is . . . one way of obtaining actual knowledge of one's lack of authority to bind a vessel," a vessel owner may defeat a maritime lien by establishing "that the supplier of necessaries either had actual knowledge that the person ordering the supplies lacked the authority to bind the vessel *or had knowledge of a prohibition of lien clause in the charter.*" *Belcher Oil Co.*, 766 F.2d at 1512–13 (emphasis added). Actual knowledge "defeats a maritime lien because '[t]he supplier is then in a position to make an informed business decision, and may refuse to supply the vessel, make other arrangements for payment, or assume the risk.'" *Am. Oil Trading, Inc.,* 47 F. Supp. 2d at 352 (quoting *Gulf Oil Trading Co. v. M/V CARIBE MAR,* 757 F.2d 743, 749 (5th Cir. 1985)). "The party seeking to bar a supplier's maritime lien has the burden of proving that the supplier actually knew of a no lien clause in the charter party or other contract." *Id.*

Here, the parties do not dispute that the above-deck crew provided by Cal Dive qualifies as necessaries, that Oceanografia was a charterer under the relevant charter party, or that the crew were delivered to the vessel as agreed. (*See* Dkt. No. 78 ¶¶ 2, 4; Dkt. No. 81 ¶ 5.) Rather, whether Cal Dive is entitled to a maritime lien in this case depends solely on whether or not Cal Dive had actual knowledge of Oceanografia's inability to bind the vessel.

9

In this case, therefore, CVI must demonstrate that Cal Dive actually knew of the no-lien clause in the charter party between CVI and Oceanografia. "To demonstrate . . . actual knowledge of the charterer's lack of authority to bind the vessel, there must be some affirmative communication by the Vessel or her Owner to one of the supplier's employees who has the ability to effect the negotiations and the contract prior to the time the contract is entered into." *O.W. Bunker Malta Ltd. v. M/V TROGIR*, No. 12 Civ. 5657, 2013 WL 326993, at *3 (C.D. Cal. Jan. 29, 2013) (citing *Gulf Oil Trading Co.*, 757 F.2d 743).

CVI argues that Cal Dive had actual notice of the no-lien provision contained in the charter party between CVI and Oceanografia because, among other reasons discussed below, Cal Dive, as ship manager, was in possession of the charter party. (*See* Dkt. No. 77 at 1.) Here, the Court concludes that a genuine dispute remains as to whether, despite receiving the entire charter party, a qualified representative of Cal Dive had actual knowledge of the no-lien provision in particular.

CVI argues that, prior to providing the pipe-laying personnel to the SAMPSON, Cal Dive was provided the charter party, which in turn "provides notice to the Cal Dive representatives to review the charter." (Dkt. No. 77 at 3.) Cal Dive does not claim that it did not receive the charter party, but rather asserts "that it never received affirmative communication of the existence of a no lien clause." (Dkt. No. 83 at 5.)

It remains unclear as to whether actual knowledge of a no-lien provision is conveyed, as a matter of law, upon the conveyance of the entire charter party without any explicit or affirmative reference to the no-lien provision. As one court found, evidence that a charterer "notified [the supplier] of the terms of their charter party" could constitute actual knowledge of the no-lien provision contained therein. *World Fuel Servs.*, 783 F.3d at 522; *see also* Charles S. Haight, Jr., *Current Developments in the American Law of Maritime Liens and Mortgages*, 9 MAR. LAW. 1,

10

10 (1984) (discussing the requirement for actual knowledge of a no-lien provision and observing that "[o]ne court, enforcing a lien for bunkers ordered by a charterer, observed that the supplier 'had no knowledge of the charter agreement'" generally, such that there was no actual knowledge of the no-lien provision in particular (quoting *Memphis Boat Refueling Service v. Ole Man River Towing, Inc.*, 550 F. Supp. 939, 941 (E.D. Mo. 1982))).

However, other courts that have addressed whether a supplier has actual knowledge of a no-lien provision appear to have found that some specific, affirmative communication of the no-lien provision itself is necessary in order to demonstrate that the supplier had actual knowledge of such clause. *See, e.g.*, *O.W. Bunker Malta Ltd.*, 2013 WL 326993, at *3 (noting that "[a]nti-lien . . . provisions in the charterer . . . contract are generally insufficient to show that a supplier had actual knowledge," which must be shown by "some affirmative communication by the Vessel or her Owner to one of the supplier's employees"); *Am. Oil Trading, Inc.*, 47 F. Supp. 2d at 352 ("The party seeking to bar a supplier's maritime lien has the burden of proving that the supplier *actually knew of a no lien clause* in the charter party or other contract." (emphasis added)).  "It is not enough . . . to have knowledge that the [vessel] was under charter, there must be actual knowledge of the no-lien provision in the charter party." *Id.* (citing *Lake U. Drydock Co. v. M/V POLAR VIKING*, 446 F. Supp. 1286, 1291 (W.D. Wash. 1978)); *see also Ramsay Scarlett & Co. v. S. S. Koh Eun*, 462 F. Supp. 277, 285 (E.D. Va. 1978) ("Knowledge of a charter alone does not bar a lien.").  As one commentator has put it, "[a]ctual knowledge that the vessel is under charter will not bar a lien unless the prohibition of lien clause itself is brought to the supplier's attention."  Schoenbaum, 1 Admiralty & Mar. Law § 9-3 (5th ed.).

In *Gulf Oil Trading Co. v. M/V CARIBE MAR*, 757 F.2d 743 (5th Cir. 1985), for example, a letter was delivered to the supplier after a first delivery, but before a second, specifically advising it of the no-lien clause.  The Court held that, "[s]ince Gulf had received the

11

letter informing it of the no lien provision before the second delivery of fuel to the vessel, Gulf

was not entitled to assert a lien with respect to that delivery." *Am. Oil Trading, Inc.*, 47 F. Supp.

2d at 352 (discussing *M/V CARIBE MAR*, 757 F.2d 743); *see also Gulf Oil Trading Co. v. M/V

FREEDOM*, No. Civ. 84-425, 1985 WL 4787, at *2 (D. Or. July 25, 1985) (finding no actual

knowledge where "[o]nly one prior receipt among others contained a no-lien stamp" and "[t]he

primary purpose of the receipt is for use in the billing process" and "not to transmit information

dealing with credit").  Similarly, in *Stevens Shipping & Terminal Co. v. M/V JAPAN RAINBOW

II*, No. 01 Civ. 669, 2002 WL 1339145 (E.D. La. June 17, 2002), *aff'd*, 334 F.3d 439 (5th Cir.

2003), the district court found actual knowledge of the no-lien provision after the managing

agent for the vessel "faxed a two-page Notice of the prohibition of liens clause contained in the

subject charter party" to the supplier.  *Id.* at *2.

   In the absence of specific, affirmative communication of the no-lien provision, the Court

is unable to determine at the summary judgment stage whether the supply by CVI of the entire

charter party was sufficient to give actual notice of the particular no-lien provision to someone

who has the ability to affect the negotiations.[4]  This is further compounded by the fact that Cal

Dive's primary witness, and a recipient of the charter party, Bill Breen, has refused to appear for

---

[4] CVI presents additional circumstantial evidence that Cal Dive was actually aware of the
no-lien provision: (1) Cal Dive was involved in drafting the charter party; (2) Cal Dive reviewed
and relied on the charter before providing the above-deck pipe-laying personnel; and (3) notice
of the no-lien clause was explicitly posted on the SAMPSON.  (Dkt. No. 77 at 1.)
   Whether Cal Dive was involved in the drafting or reviewed and relied on provisions of
the charter party is contested by Cal Dive.  (See Dkt. No. 83 at 6-7.)  For instance, CVI fails to
demonstrate that a qualified representative participated in the drafting of the charter party or
explicate the nature and extent of involvement in such drafting by such qualified individuals.
(*See* Dkt. No. 77 at 4-5; Dkt. No. 83 at 6.)  CVI also argues that Cal Dive is estopped from
asserting lack of knowledge based on its representations in certain interrogatories, but its
admission of actual knowledge of the no-lien provision in the interrogatory at issue appears
directed to a time period after it entered into a contract for the supply of the above-deck/pipe-
laying crew.  (*See* Dkt. No. 83 at 7-8.)

depositions and has evaded service of a subpoena.  (Dkt. No. 77 at 14.)

There remains, therefore, a genuine dispute as to whether CVI has satisfied its "burden of proving that the supplier actually knew of a no lien clause in the charter party."  *Am. Oil Trading, Inc.*, 47 F. Supp. 2d at 352 (emphasis added).  As such, Cal Dive's motion for summary judgment that it is entitled to an *in rem* judgment against the SAMPSON is denied.  CVI's motion for summary judgment that the *in rem* claims fail is likewise denied.

### 2.    *In Personam* **Claims Against CVI**

CVI also moves for summary judgment that the *in personam* claims against it fail.  (Dkt. No. 75 at 9-19.)  In particular, it argues that (1) there is no written contract between parties for the pipe-laying personnel at issue, and the only written agreement between CVI and Cal Dive precludes oral contracts; (2) there is no evidence of an oral agreement between CVI and Cal Dive; and (3) CVI did not guarantee Oceanografia's payment and, if it did, such an agreement is invalid under New York's Statute of Frauds.  (*Id.*)  Cal Dive disputes each of these contentions, arguing that summary judgment is therefore inappropriate.  (Dkt. No. 79 at 2-10.)

First, CVI points out that there is no written contract between CVI and Cal Dive that governs the supply of the above-deck, pipe-laying crew to the SAMPSON.  (Dkt. No. 75 at 10.)  Cal Dive neither challenges this contention nor provides evidence of an executed written contract between CVI and Cal Dive to supply above-deck, pipe-laying personnel.

Other written agreements between the parties allocate their respective responsibilities.  The charter party, entered into on November 16, 2012, "divide[s] the vessel-related responsibilities between CVI and Oceanografia, with CVI solely responsible for marine operations and Oceanografia solely responsible for pipe-laying operations."  (Dkt. No. 75 at 10.)  That agreement explicitly provides that "the management and operation of all Pipelaying Equipment shall be in the exclusive control and command of the Charterer," Oceanografia.  (Dkt.

No. 75-4 ¶ 6.1.)  It further provides that Oceanografia "shall provide any other crew or personnel required in addition to the Owner's Crew," where the Owner's Crew is explicitly defined in Schedule 1 of the charter party and does not include pipe-laying personnel.  (*Id.* ¶ 8.1.)  Months before that charter party was executed, on August 24, 2012, Oceanografia entered into a Bid Cooperation Agreement with Cal Dive to secure the pipe-laying contract.  (Dkt. No. 75-3.)  And not long after the charter party was executed, on January 15, 2013, CVI contracted with Cal Dive for vessel manning and management of the marine operations, which does not include pipe-laying personnel.  (Dkt. No. 1-1 (the Ship Management Agreement).)

The Ship Management Agreement is central to the dispute at issue because it governs the relationship between CVI and Cal Dive.  It contains two clauses that are relevant here: the forum-selection clause and the "Entire Agreement" clause.  The United States District Court for the Northern District of Florida applied the forum-selection clause when it transferred the action to this district.  (*See* Dkt. No. 44.)  That court held that "this dispute relates to the parties' rights and responsibilities in performing their obligations related to supplying crew for this vessel and that their relationship is governed by the . . . Ship Management Agreement."  (*Id.* at 5.)  Therefore, it applied the Ship Management Agreement's forum-selection clause, which specifies that "[t]he parties hereto irrevocably submit to the non-exclusive jurisdiction of the state and federal courts sitting in New York, New York with respect to any litigation arising out of this Agreement, or performance hereunder."  (*Id.* at 4 (quoting Dkt. No. 1-1 at 25).)

Before the Florida court, Cal Dive argued that the "Ship Management Agreement does not apply to this particular dispute; therefore, . . . the forum selection clause of that Agreement is similarly inapplicable."  (*Id.*)  In response, CVI argued that the Ship Management Agreement "is the only contract between [the parties] and that it governs their relationship and the present dispute over payment for personnel because the contract expressly provides for the supply and

14

management of vessel crew as between CVI and Gulf." (*Id.* at 5.)  The Florida court agreed with CVI and transferred the case pursuant to the forum-selection clause in the Ship Management Agreement.

Here, the parties rehash their arguments over the application of the forum-selection clause, but this time as applied to the "Entire Agreement" clause, which contains a no-oral-modification clause.  It provides that the Ship Management Agreement "constitutes the entire agreement between the parties" and that "[a]ny modification of this Agreement shall not be of any effect unless in writing and signed by or on behalf of the parties."  (Dkt. No. 1-1 ¶ 25.)  CVI argues that the no-oral-modification clause precludes any subsequent oral contract for the provision of personnel to the SAMPSON not provided in the Ship Management Agreement.  (Dkt. No. 75 at 14-15.)  Cal Dive argues, as it did to the Florida court, that the Ship Management Agreement "does not apply to this dispute" as "this lawsuit has nothing to do with the [Ship Management Agreement]," but is instead "based upon the supply and related expenses of 'the pipe laying crew.'"  (Dkt. No. 79 at 8.)  Indeed, Cal Dive even reargues that, "because plaintiffs' claims have nothing to do with the [Ship Management Agreement] and do not arise out of that agreement, the [Ship Management Agreement], including its forum selection clause, is inapplicable."  (*Id.* at 9.)  This argument directly conflicts with the Florida district court's holding that the relationship between Cal Dive and CVI regarding vessel management and the provision of personnel to the SAMPSON is governed by the Ship Management Agreement.  CVI, therefore, asks the Court to apply the law of the case doctrine.  (Dkt. No. 82 at 2-3.)

"The law of the case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *DiLaura v. Power Auth.*, 982 F.2d 73, 76 (2d Cir. 1992) (quoting *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991)); *see also Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 8 (2d

Cir. 1996).  And while the doctrine is "admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment," *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992), the Second Circuit has "repeatedly stated we will not depart from [the law of the case] absent 'cogent' or 'compelling' reasons," *Doe v. N.Y.C. Dep't of Social Servs.*, 709 F.2d 782, 789 (2d Cir. 1983).

"[C]ogent or compelling reasons" not to follow an earlier decision include "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Masciotta v. Clarkstown Cent. Sch. Dist.*, No. 14 Civ. 7128, 2016 WL 4449660, at *4 (S.D.N.Y. Aug. 23, 2016) (quoting *Bellezza v. Holland*, No. 09 Civ. 8434, 2011 WL 2848141, at *3 (S.D.N.Y. July 12, 2011) (internal quotation marks omitted)); *see also N. River Ins. Co. v. Phila. Reinsurance Corp.*, 63 F.3d 160, 165 (2d Cir. 1995) ("A court should be 'loathe' to revisit an earlier decision 'in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice.'" (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988))).

Here, Cal Dive provides no cogent or compelling reason to depart from the Florida district court's conclusion that the Ship Management Agreement governs the relationship between the parties with respect to the provision of personnel to the SAMPSON.  Cal Dive points to no intervening law, clear error, or manifest injustice, and provides no reason why this Court should depart from the conclusion of the Florida district court by treating the "Entire Agreement" clause differently from the forum-selection clause in the Ship Management Agreement.

"Under federal maritime law, a court 'may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision is

ambiguous.'" *United States ex rel. E. Gulf, Inc. v. Metzger Towing, Inc.*, 910 F.2d 775, 779 (11th Cir. 1990) (quoting *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332-33 (5th Cir. 1981)).  The "Entire Agreement" clause here unambiguously prohibits modification of the agreement by means of oral agreements.  And Cal Dive puts forth no argument that either maritime law or New York law renders the no-oral-modification clause in the "entire agreement" clause unenforceable.  (*See* Dkt. No. 79 at 3-6.)

Under New York law, "[a] party can overcome a no-oral-modification clause by showing either partial performance or equitable estoppel." *Home Loan Inv. Bank, F.S.B. v. Goodness & Mercy, Inc.*, No. 10 Civ. 4677, 2012 WL 1078886, at *4 (E.D.N.Y. Mar. 30, 2012).  Cal Dive argues neither.  The Court acknowledges that, as balanced against the longstanding principle that oral contracts are generally valid under maritime law, "there is not a clear answer to whether this combination 'entire agreement' and 'no oral modification' clause is necessarily unenforceable." *Regions Equip. Fin. Corp. v. AT 2400, Official No. 530775*, 640 F.3d 124, 128 (5th Cir. 2011). Because the parties do not explicitly address this issue with respect to the oral contract at issue, and because the Court concludes that the parties intended the Ship Management Agreement to prohibit subsequent oral modification, any later-alleged oral contract relating to the provision of personnel to the SAMPSON is precluded.

Finally, Cal Dive argues that "there is a dispute as to whether defendants orally guaranteed the payment if Oceanographia failed to pay argues that CarVal."  (Dkt. No. 79 at 8.) Even assuming the existence of an oral guarantee to pay, however, such a promise would be unenforceable under New York's Statute of Frauds, which requires guarantee agreements to be *in writing*.  N.Y. General Obligations Law § 5-701.

Of course, "New York's Statute of Frauds does not apply to maritime contracts, because oral contracts are valid under maritime law." *Compania Tauben S.A. v. Stolt Tankers Inc.*, 686

N.Y.S.2d 916, 918 (N.Y. Sup. Ct. 1998) (citing *Kossick*, 365 U.S. at 733–34).  The question, therefore, is whether CVI's alleged guarantee to pay for Cal Dive's services in the event of Oceanografía's failure to do so constitutes a maritime contract.

The Supreme Court has "not draw[n] clean lines between maritime and nonmaritime contracts."  *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004).  To determine if a particular contract is a maritime one, courts look to "'the nature and character of the contract,' and the true criterion is whether it has 'reference to maritime service or maritime transactions.'"  *Id.* at 24 (quoting *North Pacific S.S. Co. v. Hall Brothers Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919)).

In this particular context, however, the Second Circuit has drawn a clean line.  In *Fednav, Ltd. v. Isoramar, S.A.*, the Second Circuit held that "merely agreeing as surety 'to pay damages for another's breach of a maritime charter is not' a maritime contract."  925 F.2d 599, 601 (2d Cir. 1991) (quoting *Kossick*, 365 U.S. at 735).  In *Fednav*, the Second Circuit found that a vessel owner's alleged agreement to contribute to its charterer's settlement of a cargo dispute with a third party was not a maritime contract because the alleged contribution agreement was "separate and distinct" from the cargo dispute settlement agreement and not maritime in nature.  *Id.*  Here, too, CVI's alleged agreement to pay Cal Dive if Oceanografía failed to pay for the pipe-laying personnel is not maritime in nature.  "The reason for this rule is clear: 'The direct subject-matter of the suit is the covenant to pay such damages, which neither involves maritime service nor maritime transactions . . . .'"  *Id.* (quoting *Pacific Sur. Co. v. Leatham & Smith Towing & Wrecking Co.*, 151 F. 440, 443 (7th Cir. 1907)).  It matters not that the underlying transaction is itself maritime in nature.  *See id.*  Therefore, state law applies, rendering the alleged oral guarantee unenforceable under New York's Statute of Frauds.

CVI's motion for summary judgment that the *in personam* claims at issue fail is therefore

granted.

## IV.  Conclusion

For the reasons stated above, CarVal's motion to dismiss is DENIED; Cal Dive's motion

for summary judgment is DENIED; and CVI's motion for summary judgment is GRANTED IN

PART and DENIED IN PART.

The Clerk of Court is directed to close the motions at Docket Numbers 68 and 74.

SO ORDERED.

Dated:  March 27, 2017
        New York, New York

_____
                J. PAUL OETKEN
          United States District Judge